UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

STEPHANIE     CLARKE,     as
Personal Representative for
the ESTATE OF ELROY CLARKE

      Plaintiff,

v.                                    Case No:  2:25-cv-00376-JES-DNF

BILL PRUMMELL, JR., in his
Official Capacity as SHERIFF
OF CHARLOTE COUNTY FLORIDA,
and Chalotte County Deputies
for  the  Charlotte  County
Sheriff's    Office     BRAD
STENDER,  MITCHELL   PALMER,
and  ALEXANDER  MAGOON,  in
their Individual Capacities;

      Defendants.

---

## OPINION AND ORDER

This matter comes before the Court on review of Defendants'
Motion to Dismiss Plaintiff's Amended Complaint (Doc. #21) filed
on July 23, 2025, to which Plaintiff Stephanie Clarke filed a
Response in Opposition (Doc. #26) on August 13, 2025.  Defendants
filed a Reply (Doc. #29) on August 21, 2025.  For the reasons set
forth below, Defendants' motion is granted.

The Amended Complaint (Doc. #18) ("AC") asserts that on
October 23, 2024, Elroy Clarke ("Clarke") called 911 requesting
police assistance to remove Troy Johnson ("Johnson") from Clarke's

property in Punta Gorda, Florida.  Two deputy sheriffs were dispatched to the location and upon arrival began discussions with Clarke and Johnson.  As discussed in detail below, the interaction between Clarke and the officers (and a back-up officer who arrived) led to the officers utilizing first non-lethal and then lethal force against Clarke.  Clarke's wife, Stephanie Clarke ("Plaintiff"), as Personal Representative of Clarke's estate, brings suit against the Sheriff in his official capacity and three deputies in their individual capacities for various claims.[1]  All Defendants move to dismiss all claims.  At the request of the Court (Doc. #43), both sides filed supplements (Docs. ## 44-45) addressing authentication of the video recordings of the events.

## I.

Under Federal Rule of Civil Procedure 8(a)(2), a Complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). This obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not

---

[1] While the allegations in the Amended Complaint are clear that the deputies are being sued in their individual capacities (Doc. #18, ¶¶ 14, 27, 47, 74), the caption of the case in the Amended Complaint refers to "their Official and Individual capacities." (Doc. #1, p. 1.)  The Court strikes the "Official and" from the caption.

do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)(citation omitted). As the Eleventh Circuit has recently summarized:

> When reviewing a motion to dismiss, we accept the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim is facially plausible if the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. This plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. When making the determination of whether a complaint states a plausible claim, we draw on our judicial experience and common sense.
> . . .
> We use a two-step process to determine whether a claim survives Rule 12(b)(6) scrutiny. At the outset, we determine what must be pled for each cause of action. . . . Then, we consider the well-pleaded factual allegations . . . to determine whether they plausibly suggest an entitlement to relief.

Caterpillar Fin. Servs. Corp. v. Venequip Mach. Sales Corp., 147 F.4th 1341, 1346–47 (11th Cir. 2025)(citations and internal punctuation omitted).

In deciding a motion to dismiss, district courts generally must limit their consideration to the pleadings and any exhibits attached to the pleadings. Grossman v. Nationsbank, N.A., 225 F.3d 1228, 1231 (11th Cir. 2000). When a complaint references a 911 call or bodycam footage, a court may consider such exhibits under the incorporation-by-reference doctrine provided the exhibit

is "central to the plaintiff's claim" and "its authenticity is unchallenged." Baker v. City of Madison, 67 F.4th 1268, 1276-77 (11th Cir. 2023)(quotations omitted). Similarly, "when resolving a motion to dismiss . . ., a court may properly consider a document not referred to or attached to a complaint under the incorporation-by-reference doctrine if the document is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." Johnson v. City of Atlanta, 107 F.4th 1292, 1300 (11th Cir. 2024). "[W]here [the] video is clear and obviously contradicts the plaintiff's alleged facts, we accept the video's depiction instead of the complaint's account, and [we] view the facts in the light depicted by the video." Baker, 67 F.4th at 1277-78 (citation omitted). On the other hand, the Court "must construe all ambiguities in the video footage in favor of the plaintiff." Id. at 1277.

The AC does not explicitly refer to the 911 recording or the officers' body-worn cameras. Defendants filed an audio recording of the 911 call and three different body-worn camera videos of the incident the day after filing their motion to dismiss. (Doc. # 22, Exhs. A-D.) Exhibit A is the audio recording from the 911 call. Exhibits B, C, and D are represented to be videos from the body-worn cameras of Deputies Brad Stender ("Deputy Stender"),

-4-

Mitchell Palmer ("Deputy Palmer"), and Alexander Magoon ("Deputy Magoon") respectively.

Plaintiff asserts she challenges the authenticity of all recordings, arguing defendants should have filed a records custodian affidavit or affidavit of authentication. (Doc. #26, p. 4.) Plaintiff does not, however, argue that the videos were altered in any way or do not depict what actually happened. Upon reviewing the supplemental briefings, the Court is satisfied that it may properly consider the body camera videos but not the 911 recording.

The 911 call is important to the claims because it contains the conversation that prompted the dispatch of Deputy Stender and Deputy Palmer to the scene. Plaintiff has sufficiently undermined the completeness of that recording, however, by identifying another version of the 911 call showing that approximately one minute of the conversation was missing from the exhibit filed with the court. (Doc. #26, p. 4 n.3.) The Court therefore declines to consider the 911 recording submitted by Defendants.

The video recordings depict the exact events which are central to Plaintiff's claims and Plaintiff has not shown any of those videos have been altered. Plaintiff argues that Defendants "should have submitted a records custodian affidavit or affidavit of authenticity" alongside the videos (Doc. #26. p. 4), but the lack

of such an affidavit does not preclude consideration of their contents.  See Johnson, 107 F.4th at 1300.  The Court sees no evidence that the body-worn camera footage provided with Defendants' Motion to Dismiss was "altered in any way or [that they] do not depict what actually happened[.]"  Id. at 1301.  Even Plaintiff relies on Defendants' exhibits in her discussion of the events to support her view of the facts or at least create a disputed issue of fact.  Plaintiff's arguments in her Supplement (Doc. #45) do not undermine the trustworthiness of the recordings.  Therefore, the Court will consider the body-worn camera footage under the incorporation-by-reference doctrine.  See Swinford v. Santos, 121 F.4th 179, 188 (11th Cir. 2024).

To resolve the motion to dismiss, the Court has personally viewed and listened to the three videos but not the 911 recording.

## II.

### A.    The 911 Call and the Arrival of Deputies Stender and Palmer

On October 23, 2024, Clarke was the owner of certain property in Punta Gorda, Florida.  (Doc. #18, ¶¶ 1, 16.)  Shortly after noon that day, Clarke called 911 (or had someone call 911 for him) to have Johnson removed from Clarke's property.  (Id. ¶¶ 3, 17.)  Deputy Stender and Deputy Palmer were the first deputies to arrive at the location, arriving at approximately 12:35 p.m.  (Id. ¶ 3;

-6-

Exh. B at 00:23; Exh. C at 00:12.)  The AC alleges multiple times that Clarke was "in the middle of a mental health crisis" (or words to that effect) during his discussions with the deputies (Doc. #18, ¶¶ 4, 12, 21-22, 35, 54) and was "in obvious mental distress." (Id. ¶ 7.)  Clarke approached both deputies and informed them that Johnson was unstable and disturbing the peace.  (Id. ¶¶ 17-18; Exh. B at 00:55-1:00.)  One of the deputies asked Clarke whether either Johnson or Clarke were armed, and Clarke confirmed that neither were armed — although Clarke stated that " I am the weapon."  (Doc. #18, ¶ 18; Exh. B at 1:43-1:51.)

### B.    Deputy Stender and Deputy Palmer Split-Up to Gather Information

At this point, Deputy Stender and Deputy Palmer split up to speak with Clarke and Johnson separately.  (Exh. B at 2:00; Exh. C at 1:48.)  Deputy Palmer stayed with Clarke and explained that they were trying to get both sides of the story.  (Exh. C at 1:50.) Clarke claimed that Johnson slammed a door in Clarke's home, which prompted Clarke to ask for his removal.  (Id. at 2:21-2:35.) Clarke continued that Johnson said he could hurt Clarke if he wanted to; Clarke confirmed, however, that neither party had touched one another.  (Id. at 3:00-3:22.)

Deputy Palmer then informed Clarke that the matter was likely civil since no property damage occurred and there had been no

physical violence.  (Id. at 3:25-3:33.)  Deputy Palmer provided Clarke possible avenues to resolve the dispute.  (Id. at 3:55-4:50.)  Deputy Palmer then attempted to get Clarke's name, but Clarke refused to provide it.  (Id. at 5:13.)  Instead, Clarke ignored Deputy Palmer's repeated question and responded that Johnson had previously gotten someone to bring a gun for Johnson to use against Clarke — an action for which Clarke claimed he had already forgiven Johnson.  (Id. at 5:55-6:28.)

While Deputy Palmer spoke with Clarke, Deputy Stender spoke with Johnson.  (Exh. B at 2:05.)  Johnson said, "Elroy was losing his mind" and had a warrant out for his arrest.  (Id. at 2:10-2:20.)  Johnson continued that Clarke had an agreement for Johnson to lease a nearby barn.[2]  (Id. at 2:20-2:30.)  Johnson identified Clarke as "Elroy Clarke" and guessed Clarke's birthday was in January or February.  (Id. at 4:10-4:40.)  Utilizing this information, Deputy Stender requested a background check be conducted by the Sheriff's Office Central Communications ("CC"). (Id. at 5:05-5:20.)

---

[2] Johnson also made comments about being a "national" from Morocco with an exemption, which kept Johnson free from tyranny.  Deputy Stender told Johnson that he did not understand what Johnson was talking about and guided the conversation back to the current dispute.

Deputy Stender then obtained a notepad from his vehicle so that he could continue questioning Johnson. (Id. at 5:26.) As Deputy Stender continued to ask more questions, Johnson refused to answer any further questions since the problem was with Clarke and not himself. (Id. at 6:10-6:30.) Johnson claimed he was not a threat and did not have a side of the story to tell. (Id. at 6:34-6:50.) When Johnson attempted to go back to the barn, Deputy Stender told Johnson to stay nearby because he did not know if Johnson had any weapons in the barn. (Id. at 7:00-7:13.)

**C.    Request for Back-Up and Investigation into Clark's Alleged Warrant**

Deputy Stender then walked back to Clarke and Deputy Palmer, where he privately instructed Deputy Palmer to search DAVID — the Driver and Vehicle Information Database — for Elroy Clarke. (Id. at 7:40-7:53.) This search notified Deputy Palmer that there was a possible "hot file." (Exh. C at 9:25.)

As Deputy Palmer was viewing the DAVID file on his computer, Deputy Stender stayed with Clarke and tried to clarify what was going on. (Exh. B at 8:05.) Clarke claimed that he tried to help Johnson and that he (Clarke) decides when someone gets locked up. (Id. at 8:20-8:30.) Deputy Stender responded that Clarke lacked the power to do that and would instead need to go through the eviction process. (Id. at 8:31-8:50.) As Clarke continued to

-9-

speak to Deputy Stender, he began raising his voice and cursing about how Johnson had not held up his side of the deal. (Id. at 9:30-9:48.) Deputy Stender told Clarke to relax since he was getting himself worked up, but Clarke responded that he was calm. (Id. at 9:48-10:00.)

While Deputy Stender was speaking with Clarke, Deputy Stender yelled at Johnson to be quiet because Johnson kept interrupting them. (Id. at 9:00-9:11.) Clarke thanked Deputy Stender for doing this, and then asked Deputy Stender to take off his sunglasses so Clarke could look Deputy Stender in the eyes. (Id. at 10:05-10:10.) After initially refusing, Deputy Stender slightly lowered his sunglasses after Clarke again raised his voice, and moved so the sun would not be in Deputy Stender's eyes. (Id. at 10:15-10:27.)

Deputy Stender then told Clarke that the dispute appeared to be a civil matter given the conversation with Johnson — to which Clarke interrupted by saying "his side of the story is he doesn't fucking live here." (Id. at 10:35-10:45.) In response Deputy Stender asked Clarke to "let [him] know when [he] can speak without being interrupted." (Id. at 10:45-10:52.) Deputy Stender finished his statement, to which Clarke responded by showing two hand gestures after saying "I gave you this." (Id. at 10:52-11:00.)

-10-

Clarke then asked Deputy Stender and Deputy Palmer at least twice leave his property.  (Id. at 11:07-11:15.)

Deputy Stender attempted to provide Clarke with some avenues on how to resolve this dispute, but Clarke stated that he did not need their help as he could resolve it.  (Id. at 11:15-11:20.) Deputy Stender asked Clarke what was going to happen if the deputies left, to which Clarke responded that nothing was going to happen as he would just go back inside and enjoy his day.  (Id. at 11:20-11:35.)  Clarke then raised his voice again, getting agitated that Johnson was yelling again.  (Id. at 11:35-11:51.)

After reviewing the DAVID file, Deputy Palmer notified Deputy Stender of the potential hit but said CC had not confirmed the warrant.  (Exh. C at 12:05-12:21.)  Deputy Stender attempted to get Clarke's name, but Clarke instead replied that he did not call the police as it was someone else.  (Exh. B at 13:18-13:22.)  While Deputy Stender tried to make contact with a person inside the house, CC confirmed that Elroy Wayne Clarke had an outstanding warrant for a failure to appear for a trespass case.  (Id. at 15:40-15:50.)

CC informed Deputy Stender that a nearby deputy was about fifteen minutes away, and Deputy Stender requested that the deputy come to Clarke's home.  (Id. at 16:05-16:10.)  Deputy Stender then walked to Deputy Palmer's car to review the file.  (Id. at 17:30.)

-11-

After reviewing Clarke's file, Deputy Stender returned to his vehicle and asked how far out the deputy was given Clarke's large size and the likelihood that Clarke would resist arrest since he asserted he was a "sovereign citizen." (Id. at 19:35-20:30.)

**D.    Deputy Stender Informs Clarke of His Outstanding Warrant and Attempts to Arrest Clarke**

Upon returning to Deputy Palmer and Clarke, Deputy Stender informed Clarke of the outstanding warrant. (Id. at 20:35-20:45.) Clarke stated that Elroy Clarke was not his name and that Deputy Stender should not listen to Johnson. (Id. at 20:35-20:56.) Clarke repeated his request for Deputy Stender to take off his glasses, then raised his voice claiming his name was Ben Dey. (Id. at 20:56-21:01.) Deputy Stender kept repeating that he knew Clarke was Elroy Clarke since he saw Clarke's picture and name on his computer. (Id. at 21:01-21:07.) Clarke, still with a raised voice, asked how Deputy Stender was going to tell Clarke who he was and stated that any proof he claimed to have was "bullshit." (Id. at 21:07-21:12.)

Deputy Stender asked Clarke to calm down, but Clarke — again in a raised voice — said "you are on my land, and you are telling me to calm down?" (Id. at 21:12-21:20.) Clarke claimed that he was not troubling anyone and then repeatedly asked both Deputy Stender and Deputy Palmer to leave his property. (Id. at 21:20-

-12-

21:35.)   Clarke continued that he "[was] calm, but it [was] not about to be."   (Id. at 21:35-21:45.)

It is at this approximate point in the chronology that the AC asserts it was clear that Clarke was not in the right state of mind and was in the middle of a mental health crisis.   (Doc. #18, ¶¶ 21-22.)

**E.    Deputy Stender Threatens to Use His Taser Due to Clarke's Refusal to Comply**

Deputy Stender tried to explain that if Clarke failed to comply he would get tased, but Clarke kept cutting Deputy Stender off.   (Exh. B at 21:49-21:53.)   Deputy Stender then instructed Clarke to put his hands behind his back, but Clarke stated that he does not take orders from anyone.   (Id. at 21:58-22:03.)   Deputy Stender again told Clarke that he was about to get tased, to which Clarke asked, "for what?"   (Id. at 22:04-22:06.)   Deputy Stender told Clarke that he had a warrant for Clarke's arrest, but Clarke continued to say that he was Ben Dey before yelling at Deputy Stender asking who the warrant was for.   (Id. at 22:06-22:11.)

Deputy Stender repeatedly commanded Clarke to put his hands behind his back, but Clarke refused to comply.   (Id. at 22:15-22:20.)   Clarke refused to provide any identification showing he was Ben Dey because he was not "operating in commerce."   (Id. at 22:20-22:25.)

Deputy Stender again told Clarke that if he failed to comply, he would be tased — a warning Deputy Stender repeated twice. (Id. at 22:30.) Deputy Palmer interjected, calling Clarke by "Ben Dey" before asking him to calm down. (Exh. C at 22:28-22:35.) Deputy Palmer told Clarke that if they were mistaken that they could get it all figured out, but Clarke matched the description and photo of an Elroy Clarke. (Id. at 22:35-22:44.) Clarke again repeated that he was Ben Dey and that was all they needed, even after Deputy Stender repeatedly requested his date of birth. (Id. at 22:44-23:00.)

Clarke told the deputies to go find Elroy, claiming he did not know where Elroy was — even though Deputy Stender informed Clarke that Elroy's address was listed as Clarke's property. (Exh. B at 23:10-23:15.) Deputy Stender instructed Clarke three additional times to put his hands behind his back, however Clarke refused. (Id. at 23:15-23:26.) As Deputy Stender approached Clarke, Clarke backed up telling Deputy Stender to not touch him. (Id. at 23:42-23:45.)

Deputy Stender then pulled out his taser and again warned Clarke that if he failed to comply, he would be tased. (Id. at 23:45-23:47.) Clarke responded that if they tased him it was "gonna get hot in this bitch. I'm telling you it's gonna get hot." (Id. at 23:47-23:51.)

-14-

### F.    Deputy Stender Shoots Clarke with His Taser Twice

Deputy Stender then said "taser, taser, taser" before firing the first taser cartridge at Clarke.  (Id. at 24:08-24:10.)  Clarke removed the taser wires from his body within three to four seconds by flailing his arms around.  (Id. at 24:11-24:15.)  Deputy Stender then fired his second cartridge into Clarke, but Clarke again removed the taser wires within a few seconds.  (Id. at 24:15.) Deputy Stender instructed Deputy Palmer to tase Clarke, but Deputy Palmer did not.  Instead, Deputy Palmer commanded Clarke to get on the ground.  (Id. at 24:18-19.; Exh. C at 24:00-24:07.)  Clarke still did not comply but placed his hands at his sides before breathing heavily.  (Exh. B at 24:20-23.)

### G.    Deputy Stender Uses Pepper Spray and Attempts to Tackle Clarke

Deputy Stender announced "OC"[3] twice before shooting pepper spray at Clarke — which ultimately hit Clarke's eyes.  (Id. at 24:25.)  Deputy Stender again instructed Clarke to get on the ground, but Clarke again refused.  (Id. at 24:26.)  Clarke wiped the pepper spray off his eyes, apparently unphased by it.  (Id. at 24:28-24:29.)  Deputy Palmer notified CC that pepper spray was

---

[3] OC Spray is the technical term for what is colloquially known as pepper spray. This Court will utilize the term pepper spray throughout this Opinion and Order.

used and continued to demand that Clarke get on the ground.  (Exh. C at 24:15-24:19.)

Instead, Clarke turned his back to Deputy Stender, which Deputy Stender used as an opportunity to attempt to tackle Clarke. (Exh. B at 24:35-37.)  Deputy Stender tried to tackle Clarke, but could not bring Clarke to the ground.  (Id. at 24:38.)  Clarke turned around and pushed Deputy Stender off him, yelling "get the fuck off me. Don't touch me."  (Id. at 24:39-24:41.)  Clarke continued that if the deputies touched him, they would "see something they didn't want to see."  (Id. at 24:45-50.)  Clarke further said that neither Deputy Stender nor Deputy Palmer should touch him for "their safety and [Clarke's]."  (Id. at 24:50-24:54.) Deputy Stender then got his baton out while Deputy Palmer continued to demand that Clarke put his hands behind his back and Clarke continued to refuse.  (Id. at 24:45-24:55.)

## H.    Clarke Continues to Resist Arrest

Clarke then held up hand gestures above his head claiming they were "peace" and "love."  (Id. at 24:55-25:13.)  Clarke stated the deputies were making him angry and asked them to calm down so that they could maintain the peace.  (Id. at 25:15-25:26.)  Clarke continued to claim that he was not Elroy.  (Id. at 25:26-25:40.) Deputy Stender then notified CC that Clarke had been tased twice and sprayed with pepper spray and repeated his request for backup.

-16-

(Id. at 25:40-25:50.)  Clarke then said that "if [he] couldn't have peace then nobody can have peace."  (Id. at 25:53-25:56.)

Deputy Stender and Deputy Palmer repeated their commands that Clarke get on the ground and put his hands behind his back, but Clarke refused, saying he did not take orders from anyone, nor would he take any orders on his land.  (Id. at 25:57-26:10.) Deputy Stender informed Clarke that this would not end well if he did not comply, to which Clarke continued to yell at the deputies and call them incompetent.  (Id. at 26:10-26:18.)

Deputy Palmer continued to aim his taser at Clarke, causing Clarke to say that if Deputy Palmer shot him he would send something through Deputy Stender and Deputy Palmer, and commanded that Deputy Palmer "not shoot [him] with that shit again."  (Exh. C at 26:10-27:10.)  Clarke then held out his arm for Deputy Stender to hit him with the baton so that Deputy Stender would see it bend. (Exh. B at 27:15-27:21.)  Deputy Stender stated he did not want to hit or tase Clarke and continued to command that Clarke get on the ground.  (Id. at 27:30-28:00.)  Deputy Palmer then requested another unit be sent for back up.  (Exh. C at 27:48.)

Clarke still refused to answer any questions posed by the deputies and reiterated that he was Ben Dey.  (Exh. B at 28:20.) Clarke asked Deputy Stender and Deputy Palmer to look up Ben Dey. (Id. at 28:28-28:40.)  When both Deputy Stender and Deputy Palmer

-17-

asked for Clarke's date of birth, however, Clarke again refused to answer.  (Id.)  At this point, Clarke repeated that this was a civil matter and he wanted the deputies to leave.  (Id. at 29:28-29:48.)  Deputy Palmer informed Clarke that they were trying to figure something else out, but Clarke asked them to leave another two times.  (Exh. C at 29:20-29:36.)

## I.    Deputy Magoon Arrives at Clarke's Property

Around this time, Deputy Magoon arrived at Clarke's property. (Exh. D at 8:22.)  Clarke asked Deputy Stender to tell Deputy Magoon not to park on his grass — a request he made twice — and yelled to Deputy Magoon as he was in the car to get off his grass. (Exh. B at 29:50-29:56.)  Deputy Stender tried to tell Deputy Magoon that Clarke was tased twice and pepper sprayed; however, Deputy Magoon tased Clarke twice within a few seconds of getting out of his car.[4]  (Id. at 29:56-30:00; Exh. D at 8:28-8:35.)  Deputy Magoon then proceeded to tell Clarke to "get on the ground motherfucker. Get on the fucking ground."  (Exh. D at 8:35-8:40.)

After Deputy Magoon tased Clarke for the second time, Clarke screamed and tensed up, and Deputy Stender pushed Clarke to the ground.  (Id.)  Once Clarke was on the ground, Deputy Magoon

---

[4] Deputy Palmer also attempted to shout at Deputy Magoon in an attempt to prevent him from tasing Clarke, but could not say anything fast enough.  (Exh. C at 29:45-29:50.)

repeatedly drive-stunned Clarke.[5]    (Id. at 8:40-9:03.)    Deputy Stender instructed Deputy Magoon to ease up as Deputy Stender attempted to place Clarke in handcuffs, however, Clarke was able to roll all three deputies off him.    (Exh. B at 30:15-30:30.) Deputy Magoon pushed Clarke back to the ground, but Clarke quickly got back up.    (Exh. D at 9:03-9:10.)

Deputy Stender then struck Clarke's right knee with his baton. (Exh. B at 30:36.)    Clarke again repeated that his name was Ben Dey and called the deputies incompetent.    (Id. at 30:36-30:50.) Deputy Magoon told Clarke that "you're gonna get shot motherfucker. You're gonna get fucking shot."    (Exh. D at 9:10-9:13.)    All the deputies continued to demand Clarke get on the ground, but Clarke again refused and instead put his hands on his hips to breathe deeply while he was standing.    (Id. at 9:13-948.)    Clarke repeated that since this was a civil matter he wanted them to leave and called Johnson his brother.    (Id. at 9:48-10:05.)    After the deputies told Clarke they did not want to hurt him, Clarke stated that he did not want to hurt them either.    (Id. at 10:35-10:45.)

Deputy Stender notified back-up over the radio that they were still trying to take Clarke into custody and were "trying to avoid

---

[5] The body-worn camera is not clear on how long each drive-stun lasted, nor did Plaintiff make any factual allegations in her Complaint.

lethal [force] at this point." (Exh. B at 31:50-31:54.) Deputy Stender then told Clarke he did not want this situation to escalate any further, to which Clarke responded that he was trying to stay calm.[6] (Id. at 32:00-32:06.) At this point, Deputy Magoon began hovering his hand over his firearm. (Exh. C at 32:00.) Johnson began screaming in the background that this was racist, which all the deputies denied. (Id. at 32:07-32:25.) Deputy Magoon then proceeded to instruct Clarke to "get on the ground brother," as "they've used everything against him." (Exh. D at 10:50-11:00.)

### J.    Deputy Stender Retrieves His 12-Gauge Shotgun

Clarke then began to claim that he was a foreign diplomat and complained about being tased.[7] (Exh. C at 33:35-33:45.) Deputy Stender told Clarke that he was warned prior to being tased. Deputy Stender then went to his vehicle, retrieved his 12-gauge shotgun, and loaded it with beanbag rounds. (Exh. B at 34:15-35:18.) While Deputy Stender was doing this, Deputy Palmer and Deputy Magoon kept telling Clarke to get on the ground. (Exh. C at 34:10-34:15.) Deputy Palmer even asked politely for Ben Dey to get on the ground so they could clear this up. (Id. at 34:18.) Deputy Palmer then tried to have Clarke ground himself — referring

---

[6] At this point, the deputies were notified that the K-9 unit was approximately eleven minutes out.

[7] Clarke began to refer to the "Chevron doctrine" and repeated "C62667."

to an earlier statement by Johnson — but Deputy Magoon interjected telling Clarke that Clarke is done.   (Id. at 34:20-34:37.)

### K.    Deputy Stender Fires Three Beanbag Rounds

Clarke then asked for water, but Deputy Magoon and Deputy Palmer told Clarke that he would only get water after he complied. (Id. at 34:39-34:58.)  Deputy Stender then returned and told Clarke that Clarke did not want to be shot with the beanbag rounds, then notified CC he was going "less lethal."  (Exh. B at 35:10-35:27.) Clarke responded that if the deputies got him water he would get on the ground, but Deputy Stender responded that he could get water after he got on the ground.   (Id. at 35:30-35:41.)

Deputy Stender instructed Clarke that he would be shot if he continued to not comply, but Clarke reiterated he was not Elroy. (Id. at 35:50-36:11.)   Deputies responded by saying if that was true, he should get on the ground so they could sort it out.  (Id. at 36:11-36:19.)  Deputy Stender then instructed Deputy Palmer to move away as Deputy Stender began to point the shotgun at Clarke.[8] (Exh. C at 35:30-35:32.)

After Clarke refused to comply, Deputy Stender announced "less lethal" three times before firing the first beanbag round.

---

[8] Around this time, a fourth deputy arrived at the scene but was not involved in the conduct at issue in this suit.

(Exh. B at 36:40-36:41.)  Clarke began yelling a couple of times that he did not "know if [he] could contain it."  (Id. at 36:41-36:43.)  Deputy Stender, Deputy Palmer, and Deputy Magoon began yelling at Clarke to get on the ground, but Clarke refused to comply.  (Id. at 36:42.)  Deputy Stender then fired a second beanbag round.  (Id. at 36:45.)  When Clarke was struck with the second beanbag he said "I know" three times.  (Id. at 36:45-36:49.)

### L.    Clarke Brings His Fists to His Chest and Moves Towards the Deputies

Still standing, Clarke then brought his fists up to his chest and Deputy Stender fired a third beanbag round.  (Id. at 36:52-36:53.)  After this third round, Clarke started to move towards the deputies.  (Id. at 36:53.)  This prompted Deputy Magoon to fire six or seven rounds from his firearm as Clarke moved towards them.  (Exh. D at 15:25.)  After these shots, Clarke reached out towards Deputy Magoon's arm.  (Id. at 15:28.)  Deputy Magoon stumbled backwards as he fired another six rounds.  (Id. at 15:29.)  Clarke then began to fall to the ground after taking a few more steps.  (Exh. B at 36:57-36:58.)  Deputy Stender then fired one round before Clarke attempted to stand up.  (Id. at 36:58.)

Immediately after this, Deputy Stender notified CC that shots were fired. (Id. at 37:03-37:05.)

The deputies demanded Clarke put his hands behind his back, but Clarke was unresponsive. (Id. at 37:10-37:14.) Deputy Stender approached Clarke and placed him in handcuffs. (Id. at 37:15-37:30.) Deputy Magoon then announced over his radio that shots were fired. (Exh. D at 15:48.) Within a minute of the shots being fired, more back up arrived. (Exh. B at 37:40.) The deputies requested medical attention for Clarke, however, Clarke ultimately died from the gunshot wounds.[9] (Doc. #18, ¶ 8.)

## III.

Plaintiff filed a six-count Amended Complaint (Doc. #18) setting forth the following claims: Count I – excessive force in violation of the Fourth Amendment against Deputy Stender and Deputy Magoon; Count II – failure to intervene in violation of the Fourth Amendment against Deputy Stender and Deputy Palmer; Count III – official capacity liability against the Sheriff relating to excessive force; Count IV – Equal Protection violation against Deputy Magoon for arbitrary deprivation of life; Count V - official capacity suit against the Sheriff for violation of

---

[9] The body-worn cameras have more footage after the shooting; however, those factual details are not necessary for the motion at hand. (Exhs. B at 38:00-48:25, C at 37:10-45:42, and D at 15:52-20:25.)

Fourteenth Amendment for deliberate indifference to the right to life; and Count VI – a state law statutory claim of wrongful death against the Sheriff in his official capacity.

Defendants seek to dismiss all the claims for various reasons. The Court first addresses the three claims against the individual defendants, then the three claims against the Sheriff in his official capacity.

### A.    Deputies Stender and Magoon Are Entitled to Qualified Immunity as to Count I – Excessive Force

Defendants Deputy Stender and Deputy Magoon argue they are entitled to qualified immunity as to Count I.  (Doc. #21, pp. 11-19.)  Each asserts that Count I fails to state a violation of a constitutional right and, even if there is such a constitutional right, they assert it was not clearly established at the time.

### (1)  Qualified Immunity Principles Generally

The qualified immunity principles are well-established. Qualified immunity protects government officials from civil litigation and liability for torts committed while performing discretionary duties unless the conduct violates a clearly established statutory or constitutional right of which a reasonable person would have known. Gervin v. Florence, 139 F.4th 1236, 1260 (11th Cir. 2025); Huggins v. Sch. Dist. of Manatee Cnty., 151 F.4th 1268, 1278 (11th Cir. 2025).

-24-

Courts employ a burden-shifting analysis to determine whether official conduct is protected by qualified immunity.  <u>Huggins</u>, 151 F.4th at 1278.  First, the official must prove that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred.  <u>Id.</u> at 1278; <u>DeMarcus v. Univ. of S. Ala.</u>, 133 F.4th 1305, 1317 (11th Cir. 2025).  The actions must have been undertaken pursuant to the official's duties and within the scope of his authority.  <u>Huggins</u>, 151 F.4th at 1278.  A district court looks to the general nature of defendant's action, temporarily disregarding the alleged illegality of that act.  <u>Nute v. White</u>, 152 F. 4th 1311, 1317 (11th Cir. 2025.)

Second, if the official makes the required showing, the burden shifts to plaintiff to show that: (1) the conduct violated his statutory or constitutional right; and (2) the right was clearly established at the time of the challenged conduct.  <u>Watkins v. Davis</u>, 156 F.4th 1084, 1097 (11th Cir. 2025).  For the law to be clearly established, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances."  <u>King v. Pridmore</u>, 961 F.3d 1135, 1145 (11th Cir. 2020) (quoting <u>Hudson v. Hall</u>, 231 F.3d 1289, 1294 (11th. Cir. 2000)).  Generally, "a police officer is entitled to qualified

immunity if a reasonable police officer could have believed his or her actions were lawful in light of clearly established law and the information possessed by the officer at the time the conduct occurred." Watkins, 156 F.4th at 1097-98.

Plaintiff can show the law was "clearly established" in any of three ways: (1) identifying a qualifying case with indistinguishable facts;[10] (2) relying on a broader, clearly established principle that should control the novel facts at hand; or (3) showing that the officers' conduct was so egregious that a constitutional right was clearly violated, even in the total absence of case law. Huggins, 151 F.4th at 1261; see also Andre v. Clayton Cnty., 148 F.4th 1282, 1298 (11th Cir. 2025)(discussing qualified immunity); Aguirre v. Seminole Cnty., 158 F.4th 1276, 1296 (11th Cir. 2025)(same).

Qualified immunity is a question of law which may be asserted in a Rule 12(b)(6) motion to dismiss. Smith ex rel. Smith v. Siegelman, 322 F.3d 1290, 1294 (11th Cir. 2003). "When a defendant moves to dismiss a complaint on qualified-immunity grounds, 'the district court must dismiss any claims that fail to allege a

---

[10] A plaintiff may only rely upon binding decisions of (1) the Supreme Court of the United States; (2) the United States Court of Appeals for the Eleventh Circuit; and (3) the highest court of the pertinent state, here the Florida Supreme Court. Gervin, 139 F.4th at 1264; Wate v. Kubler, 819 F.3d 1012, 1018 (11th Cir. 2016).

violation of clearly established law.'"  Andre, 148 F.4th at 1291

(quoting Ingram v. Kubik, 30 F.4th 1241, 1249 (11th Cir. 2022)).

### (2) The Deputies Acted Within the Scope of Their Discretionary Authority

"When officers raise the defense of qualified immunity, they

have 'the burden to establish that they were acting within their

discretionary authority.'"  Settle v. Collier, 160 F.4th 1282,

1288 (11th Cir. 2025)(citation omitted.)  Here, there is no doubt

that Deputies Stender and Magoon acted within the scope of their

discretionary duties.  The AC alleges the deputies were acting

"under color of state law" as "law enforcement deputies" who were

"duly appointed and employed by the [Charlotte County Sheriff's

Office ("CCSO")]."  (Doc. #18, ¶¶ 14, 27.)

"It is well established that an arrest of someone suspected

of violating the law is within the discretionary authority of a

police officer."  Johnson, 107 F.4th at 1301.  Responding to the

911 call and attempting to arrest Clarke pursuant to an arrest

warrant was clearly conduct within the performance of the deputies'

discretionary duties and within the scope of their authority as

deputies of the CCSO.  Plowright v. Miami Dade Cnty., 102 F.4th

1358, 1363-64 (11th Cir. 2024).

Therefore, the burden shifts to Plaintiff to show that: (1)

the deputies' conduct violated Clarke's constitutional right; and

(2) the constitutional right was clearly established at the time of the challenged conduct.

### (3) Neither Deputy Stender Nor Deputy Magoon Used Excessive Force

Plaintiff does not dispute that the arrest warrant gave the deputies a lawful basis to arrest Clarke, but challenges the manner in which the arrest was carried out. <u>Richmond v. Badia</u>, 47 F.4th 1172, 1180 (11th Cir. 2022)(stating that "the manner in which a[n arrest] is conducted must nonetheless comply with the Fourth Amendment."   This is because a genuine excessive claim is "independent of whether law enforcement had the power to arrest." (internal quotation marks and citations omitted)).

Count I alleges that Deputy Stender "tased, sprayed, tackled, and hit" Clarke and eventually shot Clarke while Clarke was on the ground. (Doc. #18, ¶¶ 30, 35.)  Count I also alleges that Deputy Magoon "tased, tackled, hit, and drive tased" Clarke and eventually pulled a firearm and shot Clarke several times. (<u>Id.</u> ¶¶ 31, 35-37.)  Clarke ultimately died from the gunshot wounds.  (<u>Id.</u> ¶ 37.) Plaintiff asserts that under the circumstances this conduct constituted excessive force in violation of the Fourth Amendment. (<u>Id.</u> ¶ 42.)

-28-

### (a)   Excessive Force Analysis Framework

An excessive force claim arising in the context of an arrest is governed by the Fourth Amendment. Graham, 490 U.S. at 394; Settle, 160 F.4th at 1288.  The Supreme Court recently summarized the pertinent excessive force principles in Barnes v. Felix, 605 U.S. 73 (2025):

- The touchstone of the Fourth Amendment is reasonableness, as measured in objective terms.

- The reasonableness inquiry requires analyzing the totality of the circumstances, paying careful attention to the facts and circumstances relating to the incident as then known to the officer.

- The relevant circumstances include actions the officer took during the encounter, such as giving warnings or otherwise trying to control the encounter, and the stopped person's conduct, which is always relevant because it indicates the nature and level of the threat he poses, either to the officer or to others.

- There is no time limit on the facts which may be considered. The situation at the precise time of the offending conduct will often be what matters most, since it is the officer's choice in that moment that is under review. Earlier facts

and circumstances, however, must also be considered which bear on how a reasonable officer would have understood and responded in the situation.

• The question to be resolved is whether the force deployed by the officer was justified from the perspective of a reasonable officer on the scene, taking due account of both the individual interests and the governmental interests at stake (i.e., balancing the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate. Settle, 160 F.4th at 1288.)

Barnes, 605 U.S. 79–81.

In assessing a claim of excessive force, courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." Lombardo v. City of St. Louis, 594 U.S. 464, 466 (2021)(quoting Graham, 490 U.S. at 397). Courts

> analyze this question from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. We thus allow for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

Plumhoff v. Rickard, 572 U.S. 765, 775 (2014)(internal punctuation and citation omitted).

To determine whether the force was objectively reasonable, multiple court decisions have identified various non-exclusive factors to consider, including: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, (3) whether the suspect is actively resisting arrest or attempting to flee; (4) the need for the application of force; (5) the relationship between the need and the amount of force used; (6) the extent of the injury inflicted; (7) an officer's language during the event; [11] (8) any effort made by the officer to temper or limit the amount of force: (9) the severity of the security problem at issue; (10) the threat reasonably perceived by the officer; and (11) whether the officer gave warnings and tried to control the situation.  The Court will refer to these factors generically as the Graham factors, though many are from cases following up on the logic of Graham.

Despite the broad scope of what may be considered, the Court considers only facts that were knowable by the officers.  White v. Pauly, 580 U.S. 73, 76-77 (2017)("Because this case concerns the defense of qualified immunity, however, the Court considers only the facts that were knowable to the defendant officers.")

---

[11] But "words alone [cannot] make . . . an otherwise proper[ ]" use of force "unconstitutional under the Fourth Amendment."  Jones v. Ceinski, 136 F.4th 1057, 1062 (11th Cir. 2025)(citation omitted.)

-31-

Additionally, the Court does not consider an officer's subjective intentions. Graham, 490 U.S. at 397. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Id. at 395-96. "We do not consider whether an officer acted in good faith or sadistically and maliciously." Jones, 136 F.4th at 1062 (quoting Mobley v. Palm Beach Cnty. Sheriff Dep't, 783 F.3d 1347, 1354 (11th Cir. 2015)).

"Determining whether an officer's use of force is unconstitutionally excessive involves two steps." Charles v. Johnson, 18 F.4th 686, 699 (11th Cir. 2021). The Court first determines "whether the specific kind of force is categorically unconstitutional," and if not, weighs the Graham factors to determine if the amount of force used was excessive. Johnson, 107 F.4th at 1302.

### (b) Deputy Stender's Actions Prior to Deputy Magoon's Arrival

Plaintiff alleges that Deputy Stender's use of his taser, pepper spray, baton, and ultimately his firearm constituted excessive force in violation of the Fourth Amendment since Clarke was not suspected of committing a crime and did not retaliate or attempt to harm the deputies.  (Doc. #18, ¶¶ 29-30.)  Deputy

-32-

Stender argues that no constitutional right was violated, and even if there was a violation, the constitutional right was not clearly established at the time.

The Court divides its discussion of the circumstances facing Deputy Stender into two chronological categories, those occurring prior to any use of force, and those surrounding the use of force culminating in the use of lethal force.

### (i)  The Circumstances Leading Up to Deputy Stender's Use of Force

Deputies Stender and Palmer were dispatched to the location as the result of a 911 call in which Clarke requested law enforcement officers remove Johnson from Clarke's property.  At this time, Clarke was not suspected of any offense or violation of any law.

When Deputies Stender and Palmer arrived at the property they were approached by Clarke, who told them Johnson was unstable and was disturbing the peace.  The deputies separated Clarke and Johnson, both of whom were speaking loudly and appeared agitated. Clarke refused to provide his name when asked by Deputy Palmer. Johnson told Deputy Stender that Clarke was losing his mind, there was a warrant out for Clarke's arrest, and that Clarke's name was Elroy Clarke.

While speaking with Deputy Palmer, Clarke said neither he nor Johnson were armed.  Clarke stated, however, that he was the weapon.  The videos establish that Clarke was a large man.

The deputies attempted to verify Johnson's statement that there was an outstanding arrest warrant for Clarke.  The deputies confirmed Clarke's name and the existence of an outstanding misdemeanor arrest warrant through the CCSO dispatcher, and obtained the corresponding picture of Clarke from the computer in one of their vehicles.

The confirmed existence of the arrest warrant is important. The arrest warrant gave the deputies the lawful authority to arrest Clarke.  "[U]nder Florida law, like under federal law, a full custodial arrest is allowed even when the offense is only a misdemeanor."  Durruthy v. Pastor, 351 F.3d 1080, 1093 (11th Cir. 2003).  Additionally, Clarke would commit a first-degree misdemeanor in the deputies presence by later giving the deputies a false name and denying his actual name.  Fla. Stat. § 901.36(1) (2026).  Under Florida law "[a] law enforcement officer . . . need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. The officer is justified in the use of any force . . . [w]hich he or she reasonably believes to be necessary to defend himself or herself or another from bodily harm while making the arrest."  Fla. Stat.

§ 776.05(1) (2026); see Baxter v. Santiago-Miranda, 121 F.4th 873, 891 (11th Cir. 2024).

Plaintiff, however, correctly points out that the crime underlying the arrest warrant was a non-violent failure to appear on a trespass case, a first-degree misdemeanor. See Fla. Stat. § 843.15 (2026). (Doc. #26, p. 12.) Although Clarke was arrestable, where the crime at issue is a misdemeanor and the suspect does not pose a threat or attempt to flee, less force is appropriate. Badia, 47 F.4th at 1183. Clarke, however, continued to resist the deputies' efforts and posed at least a potential threat to the deputies and Johnson given his agitated state of mind, apparent mental issues, and reference to himself as "the weapon." Clarke began raising his voice and cursing as he discussed Johnson, who was interrupting the discussion. It was clear to a reasonable officer that the cause of the friction between Clarke and Johnson had not been resolved, and a potentially volatile situation remained.

Although he was still agitated by Johnson, Clarke directed the deputies to leave his property. Deputy Stender again attempted to get Clarke's name, but Clarke again refused to give his name. No reasonable deputy would have left the location in light of the continuing disturbance between Clarke and Johnson and the confirmed outstanding arrest warrant for Clarke.

-35-

Deputy Stender then informed Clarke of the outstanding warrant, and Clarke falsely stated that his name was not Elroy Clarke. Deputy Stender stated that he knew Clarke was Elroy Clarke because he saw his name and picture on his computer. Clarke again denied he was Elroy Clarke in a raised tone of voice. It was objectively reasonable for the deputies not to believe Clarke's denials and to believe that the arrest warrant was for the person standing before them.

Next, Deputy Stender told Clarke to put his hands behind his back, but Clarke refused. Deputy Stender told Clarke he was about to be tased, and Clarke asked, "for what?" Deputy Stender told Clarke there was a warrant for his arrest, but Clarke said he was not Clarke but Ben Dey and continued yelling at the deputy. Deputy Stender repeatedly directed Clarke to put his hands behind his back, and Clarke repeatedly refused. Clarke also refused the deputy's request to provide identification showing he was Ben Dey. Deputy Stender warned Clarke twice more that he would be tased if he failed to comply.

Deputy Palmer explained to Clarke that he matched the description and photo of Elroy Clarke and they would get it figured out if they were wrong. Clarke repeated that he was Ben Dey, and refused Deputy Stender's request for a date of birth. Clarke told Deputy Stender to go find Elroy and refused three more instructions

-36-

to put his hands behind his back.  As Deputy Stender approached Clarke told Deputy Stender not to touch him.  Deputy Stender pulled out his taser and again warned Clarke that he would be tased if he failed to comply.  Clarke responded with a veiled threat that if he was tased it was "gonna get hot in this bitch."

Non-compliance with the reasonable instructions of a deputy to place hands behind his back is a factor which weighs against Clarke in the determination of whether the forthcoming use of force was excessive.  Johnson, 107 F.4th at 1303.  Additionally, Deputy Stender expressly warned Clarke several times that he risked being tased if he remained noncompliant.  Clarke remained noncompliant. As a result, Deputy Stender resorted to increasingly forceful non-lethal techniques in an effort to make the arrest.

### (ii) Deputy Stender's Use of the Taser

Deputy Stender used various techniques of non-lethal force prior to the arrival of Deputy Magoon as the back-up officer.  Each of the techniques were necessary in the attempt to arrest Clarke on the warrant.  The Court will discuss each individual use of force prior to the arrival of Deputy Magoon in chronological order. See Alocer v. Mills, 906 F.3d 944, 951-52 (11th Cir. 2018).

Generally, "a police officer violates the Fourth Amendment if he uses gratuitous force against a suspect who is secure, not resisting, and not a safety threat to the officer or other

officers."   <u>Johnson v. City of Miami Beach</u>, 18 F.4th 1267, 1272 (11th Cir. 2021).   Similarly, "unprovoked force against a non-hostile and non-violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment."   <u>Fils v. City of Aventura</u>, 647 F.3d 1272, 1289 (11th Cir. 2011).   As the videos establish, Clarke was not secure, was resisting, had disobeyed the instructions of the deputy, and was an increasing threat to the safety of the deputies.

After giving the instructions and warnings, and receiving no compliance by Clarke, Deputy Stender fired a first taser cartridge at Clarke.   Clarke removed the taser wires from his body within three to four seconds by flailing his arms around.   Deputy Stender fired a second cartridge into Clarke, but Clarke again removed the taser wires within a few seconds.   Deputy Palmer commanded Clarke to get on the ground, but Clarke did not comply, placing his hands at his sides and breathing heavily while standing up.

The use of a taser is not categorically prohibited by the Fourth Amendment and often is not excessive force.

> [T]he use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force. This is because, where a suspect appears hostile, belligerent, and uncooperative, use of a taser might be preferable to a physical struggle causing serious harm to the suspect or the officer. On the other hand, unprovoked taser use against a non-hostile and non-violent suspect who has not disobeyed instructions

violates that suspect's rights under the Fourth Amendment.

Smith v. LePage, 834 F.3d 1285, 1294 (11th Cir. 2016)(internal punctuation and citations omitted). Here, the use of a taser by Deputy Stender was not excessive under the Fourth Amendment.

By the time Deputy Stender used his taser, Clarke had been told there was an arrest warrant for him, had lied about his name, and had been warned at least three times that failing to put his hands behind his back would result in being tased. Approximately four minutes had passed from Deputy Stender's first order for Clarke to put his hands behind his back until use of the taser. Rather than comply during this time, Clarke was hostile, uncooperative, and yelling at the deputies. Both taser shots by Deputy Stender were reasonably proportionate to the need for force since Clarke had already shown that he would not comply with reasonable instructions. See Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004)(finding the use of a taser justified when the suspect belligerent, uncooperative, and hostile); Baker, 67 F.4th at 1280 (finding the single use of a taser justified, even without any warning, where the suspect was uncooperative, attempting to leave, and swearing at the officer).

Deputy Stender's second use of the taser was reasonable since Clarke had ripped out the first taser's prongs within three to

four seconds.  Clarke still refused to comply, and flailed his arms to remove the second set of prongs within a matter of seconds. An objectively reasonable officer would have concluded the need to use the taser a second time was reasonable under the circumstances since Clarke had ripped out the first set of wires and continued to resist the deputies' orders.  Mann v. Taser Intern, Inc., 588 F.3d 1291, 1306 (11th Cir. 2009)(finding the use of taser was reasonable where suspect resisting arrest, refusing lawful commands, violent, and aggressive).  This is not a situation like Acosta v. Miami-Dade Cnty., 97 F.4th 1233, 1240 (11th Cir. 2024), where additional tasing took place *after* the suspect was taken to the ground and had stopped resisting.

### (iii) Deputy Stender's Use of Pepper Spray

Despite the tasing, Clarke did not put his hands behind his back or get to the ground as Deputy Palmer ordered.  Deputy Stender announced "OC" twice, shot pepper spray at Clarke, and again instructed Clarke to get on the ground.  Clarke again refused. Clarke wiped the pepper spray off his eyes, apparently unphased. Deputy Palmer continued to demand that Clarke get on the ground, without compliance by Clarke.

The use of OC or pepper spray is not categorically prohibited by the Fourth Amendment.  "Pepper spray is an especially noninvasive weapon and may be one very safe and effective method

-40-

of handling a violent suspect who may cause further harm to himself or others. . . . Given that pepper spray ordinarily causes only temporary discomfort, it may be reasonably employed against potentially violent suspects, . . ..” McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1245 (11th Cir. 2003). Additionally, the use of pepper spray in this case did not constitute excessive force. Clarke continued to refuse to comply, was combative, swore at the deputies, and was uncooperative. It was objectively reasonable under the circumstances to utilize the pepper spray.

### (iv) Deputy Stender's Attempted Tackle

Instead of getting on the ground as ordered, Clarke turned his back to Deputy Stender. Deputy Stender attempted to tackle Clarke but could not bring Clarke to the ground. Clarke turned around and pushed Deputy Stender off him, yelling "get the fuck off me. Do not touch me." Clarke continued that if the deputies touched him, they "would see something they didn't want to see." Clarke further said that neither Deputy Stender nor Deputy Palmer should touch him for "their safety and [Clarke's]."

A tackle is not a categorically unconstitutional kind of force, and a police officer is authorized to tackle an arrestee under some circumstances. Charles, 18 F.4th at 699. The only question is whether, under the circumstances, Deputy Stender's attempted tackle was an excessive use of force. It was clearly

not.  Charles, 18 F.4th at 699-700 (holding that the officer did not use excessive force by tackling suspect who ignored commands to place his hands behind his back and pulled away from the officer's grip to prevent handcuffing); Durruthy, 351 F.3d at 1093-1095 (holding that two arresting police officers did not use excessive force when they pulled an arrestee to the ground in an attempt to handcuff him); Johnson, 107 F.4th at 1303 (finding the tackling of noncompliant arrestee was proper).

> **(v)  Even After Deputy Stender's Use of Force Clarke Continued Resisting Arrest**

Deputy Stender then got his baton out while Deputy Palmer demanded Clarke put his hands behind his back and Clarke continued to refuse.  Clarke stated that the deputies were making him angry and asked them to calm down so that they could maintain the peace.  Clarke continued that "if [he] couldn't have peace then nobody can have peace."  Deputy Stender informed Clarke that this would not end well if he did not comply, to which Clarke continued to yell at the deputies and call them incompetent.  Deputies Stender and Palmer repeated their commands that Clarke get on the ground and put his hands behind his back, but Clarke refused, saying he did not take orders from anyone or take any orders on his land.  Clarke continued to claim that he was not Elroy.  Deputy Palmer continued to aim his taser at Clarke.  Clarke stated that if Deputy Palmer

shot him he would send something through Deputy Stender and Deputy Palmer, and Clarke commanded that Deputy Palmer "not shoot [him] with that shit again."  Clarke then held out his arm for Deputy Stender to hit him with the baton so that Deputy Stender would see it bend.  Deputy Stender stated he did not want to hit or tase Clarke and continued to command Clarke to get on the ground.

### (c)  Deputy Stender's and Deputy Magoon's Non-Lethal Actions

Deputy Magoon arrived about this time, so the Court examines the conduct of both Deputy Stender and Deputy Magoon from this point in chronology forward.

### (i)  Deputy Magoon's Use of the Taser

When Deputy Magoon arrived, Clarke was still noncompliant and resisting.  Within a few seconds of getting out of his car, Deputy Magoon tased Clarke twice, telling Clarke to "get on the ground motherfucker. Get on the fucking ground."  When Deputy Magoon tased Clarke for the second time, Clarke screamed and tensed up, and Deputy Stender pushed Clarke to the ground.  Once Clarke was on the ground, Deputy Magoon repeatedly drive-stunned Clarke with the taser.[12]  Deputy Stender instructed Deputy Magoon to ease up as

---

[12] A taser deployed in the "drive stun" mode is "a less potent application of the taser device that is only intended to stun the target."  Charles, 18 F.4th at 693.

Deputy Stender attempted to place Clarke in handcuffs.  However, Clarke was able to roll all three deputies off him.  Deputy Magoon pushed Clarke back to the ground, but Clarke quickly got back up.

Deputy Magoon's use of his taser upon arriving was objectively reasonable under the circumstances.  Deputy Magoon arrived after both Deputy Palmer and Deputy Stender had been struggling with Clarke for approximately nine minutes.  While Deputy Magoon utilized his taser within a few seconds of arriving, Clarke was still refusing lawful commands and had already physically resisted arrest.  See Johnson, 107 F.4th at 1292 ("With respect to a claim of excessive force . . . [n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.")  It was not until a fourth taser that deputies were able to get Clarke to the ground.

In light of Clarke's continual refusal to follow instructions and physical resistance, the force utilized by Deputy Magoon was not unreasonable.  Hoyt v. Cooks, 672 F.3d 972, 979-80 (11th Cir. 2012)(holding that the officers were entitled to qualified immunity where the suspect refused to comply with officers and physically resisted arrest while being dry-stunned).  Further, the circumstances in this case were unlike, for example, Oliver v. Fiorino, 586 F.3d 898, 903, 906-07 (11th Cir. 2009)(holding that the repeated use of the taser was unreasonable where suspect

dropped to the ground after the first taser and never got back up, kicked, punched, or otherwise threatened the officers).

Deputy Magoon's use of his taser in drive-stun mode was also reasonable under the circumstances.  While Deputy Stender told Deputy Magoon to ease up, Clarke was still actively rolling around with the deputies, soon succeeded in tossing the deputies off him, and refused to let any of the deputies place handcuffs on him. Such use of the taser was objectively reasonable under the circumstances.

### (ii) Deputy Stender's Use of the Baton

Deputy Stender then struck Clarke's right knee with his baton. Clarke repeated that his name was Ben Dey and called the deputies incompetent, but did not fall.

Use of a baton is not categorically prohibited by the Fourth Amendment.  Benton v. Hopkins, 190 F. App'x 856, 860 (11th Cir. 2006).  Further, Deputy Stender's use of the baton was objectively reasonable under the circumstances.  The baton did not knock Clarke to the ground and Clarke was still able to resist arrest.  The deputies had already utilized other non-lethal tools at their disposal, none of which were successful.

> **(iii) Deputy Magoon's Warning of Lethal Force, Deputy Stender's Unsuccessful Effort to De-escalate the situation, and Deputy Magoon's Hand Over His Firearm**

Deputy Magoon told Clarke that "you're gonna get shot motherfucker. You're gonna get fucking shot." All three deputies continued to demand Clarke get on the ground, but Clarke refused. Clarke repeated that since this was a civil matter he wanted them to leave. After the deputies told Clarke they did not want to hurt him, Clarke stated that he did not want to hurt them either.

Deputy Stender notified other back-up officers over the radio that they were still trying to take Clarke into custody and were "trying to avoid lethal [force] at this point." Deputy Stender told Clarke he did not want this situation to escalate any further, to which Clarke responded that he was trying to stay calm.

Soon after, Deputy Magoon began hovering his hand over his firearm. Johnson began screaming in the background that this was racist, which all the deputies denied. Deputy Magoon then proceeded to instruct Clarke to "get on the ground brother," as "they've used everything against him." Clarke then claimed that he was a foreign diplomat and complained about being tased. Deputy Stender told Clarke that he was warned prior to being tased.

-46-

**(iv) Deputy Stender's Use of Bean Bag Rounds[13]**

Deputy Stender went to his vehicle, retrieved his 12-gauge shotgun, and loaded it with beanbag rounds. Deputy Palmer and Deputy Magoon kept telling Clarke to get on the ground, but he refused. Deputy Stender told Clarke that Clarke did not want to be shot with the beanbag rounds. Deputy Stender instructed Clarke that he would be shot if he continued to not comply, but Clarke reiterated he was not Elroy. Deputies responded by saying if that was true, Clarke should get on the ground so they could sort it out. Clarke did not do so.

Deputy Stender began to point the shotgun at Clarke, and announced "less lethal" three times before firing the first beanbag round. Clarke yelled a couple of times that he didn't "know if [he] could contain it." All the deputies yelled at Clarke to get on the ground, but Clarke refused. Deputy Stender then fired a second beanbag round. Still standing, Clarke brought his fists up to his chest and Deputy Stender fired a third beanbag round.

The use of beanbag rounds is not categorically a violation of the Fourth Amendment, and did not constitute excessive force in this case. See generally Glenn v. City of Columbus, 375 F. App'x

---

[13] While Plaintiff does not specifically identify the beanbag rounds as constituting excessive force, they are clearly part of the facts which must be considered under the totality of the circumstances.

928, 932-33 (11th Cir. 2010)(discussing the lack of cases involving beanbag munitions in any relevant courts for qualified immunity analysis).

None of the non-lethal tools utilized by Deputy Stender or Deputy Magoon were categorically prohibited by the Fourth Amendment or excessive under the circumstances.  The Court next examines the use of lethal force.

### (d)    Deputy Magoon's and Deputy Stender's Use of Lethal Force

After the third beanbag round, Clarke started to move towards the deputies holding his fists at chest level.  As Clarke moved toward the deputies, Deputy Magoon fired six or seven rounds from his firearm.  Clarke reached out towards Deputy Magoon's arm, and Deputy Magoon stumbled backwards as he fired another six rounds. Clarke took a few more steps then began to fall to the ground. Deputy Stender then fired one round before Clarke attempted to stand up.  Clarke ultimately died from the gunshot wounds.

Lethal force is not categorically a violation of the Fourth Amendment.  As relevant here, an officer may constitutionally use deadly force when he has probable cause to believe the suspect poses a threat of serious physical harm to the officer or others and has given warning about the potential use of deadly force, if feasible.  Morton v. Kirkland, 707 F.3d 1261, 1281 (11th Cir.

2013)(citing Garner, 471 U.S. at 11); see also Swinford, 121 F.4th at 189-90 (stating that prior to the use of force "some warning" should be given "if feasible," but a warning is not always required to use lethal force).  To be entitled to qualified immunity, an officer is required to have at least "arguable probable cause." St. George v. Pinellas Cnty., 285 F.3d 1334, 1337 (11th Cir. 2002).

Neither Deputy Stender nor Deputy Magoon utilized excessive force.  The videos clearly show Clarke verbally and physically resisting arrest and refusing to comply with objectively reasonable police commands.  During the encounter Clarke had: (1) ripped out the taser prongs from his body three times; (2) pushed Deputy Stender off of him when Deputy Stender tried to tackle Clarke and told Deputy Stender to "Get the fuck off of [him]"; (3) wiped off the pepper spray from his eyes and continue resisting arrest; (4) rolled all three deputies off of him as they attempted to handcuff him; (5) repeatedly refused commands; and (6) brought his fists up to his chest before moving towards the deputies.  Even though Clarke was not armed, Clarke repeatedly made what a reasonable person would deem to be implied threats to the officers. The deputies were not obligated to negotiate with Clarke.  See Baxter, 121 F.4th at 888.

Deputy Stender and Deputy Palmer had arguable probable cause that Clarke posed a threat of serious physical harm to the

officers.   See Morton, 707 F.3d at 1281-82.   For the roughly sixteen minutes that were leading up to the moment that Deputy Magoon first fired, Clarke continually refused to comply with at least sixty verbal commands, acted erratically, and physically resisted arrest, even after non-lethal force was used.   While Deputy Magoon had his firearm drawn as Deputy Stender was utilizing the beanbag rounds, it was not until Clarke began to move towards the deputies that Deputy Magoon fired six or seven rounds.

Even after those six or seven rounds were discharged, Clarke was still able to move towards the deputies and even reached out towards Deputy Magoon's arm.[14]   Deputy Magoon stumbled backwards and discharged another six rounds, which ultimately caused Clarke to collapse to the ground.   Between the time that Clarke fell to the ground and attempted to stand back up, Deputy Stender fired his only shot at Clarke.[15]   An objectively reasonable officer would believe that Clarke still posed a threat, even without a firearm, given his demonstrated ability to fight after all non-lethal force was utilized and his attempt to reach out towards Deputy Magoon.

---

[14] Defendants characterize this action as Clarke reaching for Deputy Magoon's firearm.   This could be true, but none of the bodycam footage clearly depicts this.   As such, the Court construes the ambiguity in the footage in favor of Plaintiff at the motion to dismiss stage.

[15] This entire sequence took place is approximately six or seven seconds.

The Eleventh Circuit has made it clear that law enforcement is not expected to wait and hope for the best in situations like this.  See Gutierrez, 627 F.3d at 821.  The deputies had already utilized all non-lethal tools at their disposal and had been trying to take Clarke into custody for over sixteen minutes.

Additionally, Deputy Magoon provided some warning before deadly force was used.  Deputy Magoon told Clarke that he was "gonna get shot motherfucker. You're gonna get fucking shot." Plaintiff refers to Deputy Magoon's statement as "threats," a characterization the Court will accept for purposes of the motion to dismiss.  However characterized, the statements certainly constituted a warning "of some sort of the use of deadly force. See Morton, 707 F.3d at 1282.  Later in the encounter, Deputy Magoon told Clarke that they had used everything they had against him and told him to "get on the ground brother."

An objectively reasonable officer would conclude that they had probable cause to believe Clarke posed a threat of serious physical harm to the officers when considering: (1) none of the non-lethal force used was effective; (2) sixteen minutes had passed where the deputies attempted to have Clarke comply with over sixty commands; (3) Clarke's sudden movement towards the deputies with his fists held at his chests after saying "I know" two times; and (4) Clarke's ability to reach out to Deputy Magoon's arm even after

six to seven rounds were fired. See Perez v. Suszcynski, 809 F.3d 1213, 1219 (11th Cir. 2016)(finding the shooting of an individual that was subdued, compliant, and on the ground to be excessive). Accordingly, the shooting of Clarke did not constitute excessive force in violation of the Fourth Amendment.

### (4) Under These Facts, the Right Was Not Clearly Established

Even if there was a constitutional violation, Plaintiff must establish that the constitutional right was clearly established. A right is clearly established when "controlling law gave the official 'fair warning' that his conduct violated that right." Jones, 136 F.4th at 1065. As stated earlier, Plaintiff can show fair warning was given by identifying "a materially similar case, appealing to a broader, clearly established principle that should control the novel facts at hand, or establishing that the challenged conduct so obviously violates the Constitution that prior case law is unnecessary to clarify its lawlessness." Id. (internal quotations omitted); see Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000).

In this case, there is no precedent that has staked out a bright line that would have made a reasonable official understand that what he is doing violates the right. While Plaintiff has alleged that Deputy Stender and Deputy Magoon violated a clearly

established right, she has provided no case law supporting such proposition and the Court finds none.[16]

Plaintiff's reliance on <u>Oliver</u>, in her Response is misplaced. 586 F.3d 898.  The decedent in <u>Oliver</u> was not suspected of any crime and complied with each of the officer's commands.  <u>Id.</u> at 901-02.  Oliver never acted in any threatening or belligerent manner, nor did he curse at the officer.  <u>Id.</u> at 902-03.  Once backup arrived, Oliver continued to comply with the second officer's commands.  <u>Id.</u>  Even after the second officer used physical force to get Oliver across the street, Oliver did not attempt to grab or otherwise hit the officer.  <u>Id.</u>  Despite such compliance, the first officer tased Oliver without any warning numerous times after Oliver had already dropped to the ground after the first taser.  <u>Id.</u> at 903.  Literally none of these facts are similar to the situation with Clarke.  Plaintiff cannot rely upon <u>Oliver</u> to show that such use of force violated a clearly established right as the facts are materially distinguishable.

In the absence of case law, it is not clear that every reasonable officer would have known that the force used was

---

[16] Contrary to Defendants' argument, the Court declines to treat the second prong of the qualified immunity analysis as being waived because Plaintiff did not cite a controlling case.  Plaintiff properly alleged that such right was clearly established, even if she failed to provide any case law supporting the argument.

excessive under the circumstances.   Such conduct must be "so outrageous that it clearly goes 'so far beyond'" the hazy border between excessive and acceptable force.   See Fils, 647 F.3d at 1291-92 (citing Reese v. Herbert, 527 F.3d 1253, 1274 (11th Cir. 2008)).   These facts show a progression from the use of minimally intrusive non-lethal force — i.e., the taser — all the way to lethal force.   Prior to each increase in the use of force, the deputies warned Clarke that continued refusal to comply will cause them to use more force.   While the encounter resulted in the tragic death of Clarke, it cannot be said that either case law or the specific factual scenario shows any conduct that went so far beyond the hazy border between excessive and acceptable force as to have violated any clearly established right.   See Priester, 208 F.3d at 927; Fils, 647 F.3d at 1291-92.

Because there was not constitutional violation, or alternatively there was no clearly established constitutional right which was violated in the circumstances of this case, Deputy Stender and Deputy Magoon are entitled to qualified immunity. Therefore, Count I is dismissed without prejudice.

**B.    Plaintiff Fails to State a Failure to Intervene Claim Because There Was No Obligation to Intervene Nor Were the Deputies in a Position to Intervene**

In Count II (Doc. #18, ¶¶ 46-59), Plaintiff alleges that Deputy Stender and Deputy Palmer violated the Fourth Amendment by

failing to intervene in Deputy Magoon's excessive use of force. Although Count II recognizes that both deputies were physically engaged with Clarke themselves (Id. ¶¶ 48, 50) and that Deputy Stender told Deputy Magoon at one point to "ease up," (Id. ¶ 51), it alleges that both deputies "were present at the scene and in close proximity as" Deputy Magoon engaged in the following excessive conduct: (1) "drive-tased Elroy Clarke with relentless aggression" and in an "unrelenting, unreasonable, and grossly disproportionate" manner (Id. ¶ 51); (2) verbally threaten to shoot Clarke (Id. ¶ 53); (3) escalated the non-lethal encounter by unholstering his firearm (Id.); (4) firing multiple live rounds from the firearm (Id.). Plaintiff further alleges Deputy Stender and Deputy Palmer "had a clear, reasonable, and realistic opportunity to intervene to stop" all aspects of Deputy Magoon's excessive force. (Id. ¶¶ 51, 53.) Plaintiff alleges that both Deputy Stender and Deputy Palmer "took no steps to de-escalate the encounter, did not discourage [the] use of lethal force, and failed to physically intervene or delay the drive tasing and/or shooting[.]" (Id., ¶ 54.) Deputy Stender and Deputy Palmer argue that Plaintiff failed to plausibly allege any underlying excessive force, thereby requiring that Count II be dismissed.[17]

---

[17] Defendants Deputy Stender and Deputy Palmer also argue – in a conclusory fashion – that they are entitled to qualified immunity as to

"The principle that an officer must intervene when he or she witnesses unconstitutional force has been clearly established in this Circuit for decades." Helm v. Rainbow City, 989 F.3d 1265, 1272 (11th Cir. 2021). "[A]n officer who is present at the scene and fails to take reasonable steps to protect the victim of another officer's use of excessive force[] can be held liable for his nonfeasance." Nute, 152 F.4th at 1319 (quoting Velazquez v. City of Hialeah, 484 F.3d 1340. 1341 (11th Cir. 2007)(quotation marks omitted)). One such method to intervene is by verbally commanding an officer or directing them to stop using the force that is excessive. Id.; Priester, 208 F.3d at 923-28.  The officer, however, is only obligated to take such reasonable steps if they are in a position where they can reasonably do so. See Jackson, 97 F.4th at 1362. Where the use of force "happened quickly and was over quickly," an officer usually does not have the opportunity to intervene. Id. at 1362-63; see also Nute, 152 F.4th at 1320 (stating where infliction of excessive occurred too quickly for an officer to have a reasonable opportunity to intervene, they are entitled to qualified immunity).

---

Count II.  (Doc. #21, p. 20.)  Given the lack of an underlying excessive force finding, the Court will not analyze whether Deputies Stender and Palmer are entitled to qualified immunity as to Count II.

Since Deputy Magoon's use of force — as alleged by Plaintiff and seen in the bodycam footage — did not constitute excessive force, Deputy Stender and Deputy Palmer had no obligation to intervene.   See Williams v. Radford, 64 F.4th 1185, 1199 (11th Cir. 2023)("Of course, a failure-to-intervene claim requires an underlying constitutional violation."); Sebastian v. Ortiz, 918 F.3d 1301, 1312 (11th Cir. 2019)("Plainly, an officer cannot be liable for failing to stop or intervene when there was no constitutional violation being committed."); Crenshaw v. Lister, 556 F.3d 1283, 1294 (11th Cir. 2009)(finding no obligation to intervene if the other officer's force is not excessive).  As such, Count II fails to state a claim.

Even if excessive force had been sufficiently alleged, there is no claim for failure to intervene.  An officer is obligated to take reasonable steps to intervene in another officer's use of excessive force only if he is in a position where he can reasonably do so. Crenshaw, 556 F.3d at 1293-94.  As Plaintiff alleges, both Deputy Stender and Deputy Palmer were already physically engaged with Clarke and Deputy Stender told Deputy Magoon to "ease up." Additionally, the videos establish that when Magoon fired his firearm, he only did so after Clarke moved towards the deputies and finished firing within six or seven seconds.  Neither Deputy Stender nor Deputy Palmer were in a position to intervene as they

-57-

were focused on attempting to arrest Clarke. Jackson, 97 F.4th at 1362-64. Officers have to make rushed judgments "in circumstances that are tense, uncertain, and rapidly evolving." Corbitt v. Vickers, 929 F.3d 1304, 1321 (11th Cir. 2019)(quotation marks omitted). "[O]n-the-scene officers are often hampered by incomplete information and forced to make a split-second decision between action and inaction." Davis v. City of Apopka, 78 F.4th 1326, 1335 (11th Cir. 2023)(quotation marks omitted). As currently pled and depicted in the videos, there was not a reasonable opportunity for Deputy Stender and Deputy Palmer to intervene. Accordingly, Count II is dismissed without prejudice.

**C.    Plaintiff Fails to State an Equal Protection Clause Claim Because There Are No Allegations That Similarly-Situated People Were Treated Differently**

Count IV (Doc. #18, ¶¶ 73-82) alleges that Deputy Magoon violated Clarke's Fourteenth Amendment Equal Protection right to be free from discriminatory treatment based on his race — African American of Jamaican descent - and mental health condition - having a mental health crisis. (Id. ¶¶ 75-76.)  Count IV alleges that Deputy Magoon engaged in excess force, culminating in shooting Clarke, causing his death. (Id. ¶77.)  Plaintiff asserts "[o]n information and belief" that "similarly situated individuals in Charlotte County — particularly non-African American individuals or those not in mental health crises — have received de-escalation

-58-

responses from CCSO deputies without excessive or deadly force." (Id. ¶ 78.) These actions were motivated by discriminatory animus based on Clarke's race and "lacked any rational basis and constituted intentional discrimination" in violation of his equal protection rights.  (Id. ¶¶ 79-80.)  Specifically, the "racially motivated use of lethal force against Clarke violated his 14th Amendment right to equal protection of the laws."  (Id. ¶ 81.)

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1, cl. 4.  This is "essentially a direction that all persons similarly situated should be treated alike," and "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."  Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty., 57 F.4th 791, 800-01 (11th Cir. 2022)(citations omitted).  In short, "[t]he Equal Protection Clause requires that the government treat similarly situated persons in a similar manner."  Gary v. City of Warner Robins, 311 F.3d 1334, 1337 (11th Cir. 2002).  To prevail on an equal protection claim, a plaintiff must show that they were treated differently from other similarly situated individuals. "[D]ifferent treatment of dissimilarly situated persons does not

violate the equal protection clause." E&T Realty v. Strickland, 830 F.2d 1107, 1109 (11th Cir. 1987).

Deputy Magoon argues that Plaintiff fails to state an equal protection claim. (Doc. #21, p. 20.) The Court agrees. Conclusory statements fail to show any other similarly situated individual who was treated differently. See McCants v. City of Mobile, 752 F. App'x 744, 749 (11th Cir. 2018)(dismissing an equal protection claim against a police officer where the plaintiff alleged no facts to suggest that a white driver was not asked for their license and insurance information, nor did the plaintiff point to any similarly situated individual). Accordingly, Count IV is dismissed without prejudice.

### D. Without Any Underlying Constitutional Violations, Plaintiff's Monell Claims Fail

A municipality cannot be held vicariously liable for the constitutional violations of its employee. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). The government as an entity may be responsible, however, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." See id. To impose such liability, a plaintiff must show that: (1) his constitutional rights were violated; (2) the municipality had a custom or policy that

-60-

constituted deliberate indifference to that constitutional right; and (3) the policy or custom caused the violation.  See Underwood v. City of Bessemer, 11 F.4th 1317, 1333 (11th Cir. 2021).

Liability may be based on an official policy or "a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker."  Khoury v. Miami-Dade Cnty. Sch. Bd., 4 F.4th 1118, 1131 (11th Cir. 2021).  "A policy is a decision that is officially adopted by the municipality or created by an official of such rank that he or she could be said to be acting on behalf of the municipality," while a "custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law."  See Goebert v. Lee Cnty., 510 F.3d 1312, 1332 (11th Cir. 2007)(citations omitted).

When a plaintiff alleges a failure to train, they must show "a pattern of similar constitutional violations by untrained employees . . . to demonstrate deliberate indifference."  See Connick v. Thompson, 563 U.S. 51, 62 (2011).  There must be "some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action."  See Lewis v. City of W. Palm Beach, 561 F.3d 1288, 1293 (11th Cir. 2009).

The Sheriff argues that the AC has failed to state a claim under Monell because: (1) there was no underlying constitutional violation; (2) Plaintiff has failed to allege sufficient facts to establish a practice of repeated constitutional violations to impose liability; and (3) the AC only offers Clarke's own experience.  (Doc. #21, p. 23.)

As discussed above, none of the deputies have inflicted any constitutional harm.  As such, Sheriff Prummell, in his official capacity as Sheriff, cannot be held liable under Monell.  "Monell and its progeny do not 'authorize[] the award of damages against a municipal [entity] based on the actions of one of its officers when in fact . . . the officer inflicted no constitutional harm.'" See Andre, 148 F.4th at 1298.  Accordingly, Counts III and V are dismissed without prejudice.

Similarly, the supervisory liability claim against the Sheriff fails because "[t]here can be no policy-based liability or supervisory liability when there is no underlying constitutional violation."  Knight ex rel. Kerr v. Miami-Dade Cnty., 856 F.3d 795, 821 (11th Cir. 2017); accord City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have

authorized the use of constitutionally excessive force is quite beside the point.")(emphasis omitted).

**E.    Plaintiff Fails to State a Wrongful Death Claim Because There Is No Underlying Tort**

Finally, Sheriff Prummell argues that Count VI must be dismissed because Plaintiff has failed to plausibly allege any underlying wrongful conduct by the deputies as required to maintain a state claim for wrongful death.

**(1)    Plaintiff's Theory of Battery Fails to State a Claim**

Florida's Wrongful Death Acts allows for recovery when the death of a person is caused by negligence or a "wrongful act," which includes the use of excessive force by a police officer. Fla. Stat. § 768.19 (2026).  Any liability under state law attributed to Deputy Stender and Deputy Magoon for the use of excessive force must arise from the intentional tort of battery, not negligence.  City of Miami v. Sanders, 672 So. 2d 46, 48 (Fla. 3d DCA 1996).  This claim turns on whether the amount of force used was reasonable under the circumstances.  See id. at 48.  As discussed above, Deputy Stender and Deputy Magoon's use of deadly force was reasonable.  See supra Section III.A.  Accordingly, Plaintiff's theory of battery fails to state a claim.

### (2) Plaintiff's Theory of Negligent Hiring Fails to State a Claim

Plaintiff in the alternative alleges that Prummell negligently hired Deputy Magoon given his concerning background. To state a claim for negligent hiring under Florida law, a plaintiff must allege facts showing: (1) the employer was required to make an appropriate investigation of the employee and failed to do so; (2) an appropriate investigation would have revealed the unsuitability of the employee for the particular duty to be performed or for employment in general; and (3) it was unreasonable for the employer to hire the employee in light of the information he knew or should have known. See Malicki v. Doe, 814 So. 2d 347, 362 (Fla. 2002). Liability, however, will only attach for the "willful tort of his employee committed against a third person . . .." See Tallahassee Furniture Co., Inc. v. Harrison, 583 So. 2d 744, 750 (Fla. 1st DCA 1991).

Taking Plaintiff's allegations as true, she fails to allege any tort committed by Deputy Magoon. As discussed above, Deputy Magoon's use of force was reasonable under the circumstances. Therefore, Plaintiff's theory of negligent hiring fails to state a claim.

### (3)   Plaintiff's Failure to Train Theory Fails to State a Claim

Plaintiff also alleges that Prummell's deliberate indifference to the training of its officers also constitutes a wrongful act.  Under Florida law, an employer is liable in tort for reasonably foreseeable damages resulting from the negligent training of its employees and agents.  See Lewis v. City of St. Petersburg, 260 F.3d 1260, 1265 (11th Cir. 2001).

Such claim, however, fails as Plaintiff cannot plausibly allege that Sheriff Prummell's failure to train led to any wrongful conduct.  Cf. Acts Ret. Life Cmtys. Inc. v. Estate of Zimmer, 206 So. 3d 112, 115 (Fla. DCA. 2016)(stating that the underlying action of an employee must itself be a tort); Winters v. Ranum, 730 F. App'x 826, 830-31 (11th Cir. 2018)(stating that where an officer used reasonable force in an arrest there is no negligent training claim).  Without such allegations to make a plausible showing that Deputy Magoon's actions were excessive, Plaintiff's theory of negligent hiring fails to plausibly state a claim for wrongful death.

For the reasons set forth in this order, the Defendants' Motion to Dismiss Plaintiff's Amended Complaint will be granted.

Accordingly, it is now

**ORDERED:**

-65-

Defendants' Motion to Dismiss (Doc. #21) is **GRANTED** as follows:

(1)  Counts I-VI are **DISMISSED without prejudice.**

(2)  Plaintiff may file a Second Amended Complaint within **FOURTEEN (14) DAYS** of this Order.

**DONE AND ORDERED** at Fort Myers, Florida, this ___31st___ day of March 2026.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Parties of record